## WOODS v. EDWARDS.

### No. 5209.

District Court, E. D. Missouri, E. D.

Nov. 20, 1947.

Joseph E. Babka and Thomas R. R. Ely, both of St. Louis, Mo., for plaintiff.

N. Murry Edwards and James A. Waechter, both of St. Louis, Mo., for defendant.

HULEN, District Judge.

The complaint is in two counts, one for injunctive relief and the other for double damages for alleged overcharge of rent received by defendant from Dorothy Morgan. The case was submitted on stipulation of facts and testimony of Dorothy Morgan.

Plaintiff pleads an overcharge by defendant in renting housing accommodations to Dorothy Morgan by charging her $100.00 per month for a period from October 1, 1946 to January 1, 1947, when maximum legal rent was $35.00 per month. The premises are 3825 Delmar Boulevard, St. Louis, Missouri. The dispute hangs on defendant and Dorothy Morgan signing a lease by which Dorothy Morgan agreed to pay a monthly rent of $35.00 per month for the dwelling house at 3825 Delmar Boulevard, $35.00 for a vacant lot on one side of the dwelling, and $30.00 for a vacant lot on the other side of the dwelling. Plaintiff's position is, defendant required Dorothy Morgan to rent the two lots as a condition for renting her the housing accommodation and the transaction is a tying agreement evading and in conflict with the rent regulations under the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 901 et seq. Defendant counters—(1) that Dorothy Morgan did not occupy the dwelling but operated a rooming-house under management of an agent and therefore the property is business and not housing accommodations under the terms of the Act; (2) that renting of the lots was a good faith transaction without intent to and not evasive of rent regulations.

Paragraph 7 of the stipulation recites: "The parties agree that the only question

for the Court to determine is whether defendant lawfully charged more than the maximum legal rent on housing accommodations at 3825 Delmar Boulevard, St. Louis, Missouri." The only additional issue that could be in the case is wilful violation.

Defendant owned a 14-room dwelling house at 3825 Delmar Boulevard and a vacant lot on each side of the lot occupied by the dwelling. The dwelling was registered "with O.P.A. at $35.00 a month in 1942". The 1942 registration was the last. J. A. Dunn was occupying the house on September 1, 1946, and operating a rooming house. Dunn was paying "$35.00 a month for said building * * * in addition thereto did rent the * * * lot * * * adjoining * * * and pay the defendant $30.00 a month for the rent thereof." In September 1946 Dorothy Morgan purchased the rooming house equipment from Dunn. Before completing the purchase Dorothy Morgan interviewed defendant and obtained his consent to occupy the premises. Dorothy Morgan testified, on her first interview with defendant she understood she would be required to rent one lot and that the rent "would be $65.00". Dorothy Morgan completed purchase of the furniture, started operation of a rooming house through an agent, and then pressed the defendant for a lease. She made many requests of the defendant to prepare the lease. Some time between purchase of the furnishings and execution of the lease about October 14, 1946, defendant informed Dorothy Morgan that the dwelling and two lots "had to rent together because they had to sell together". Defendant and Dorothy Morgan then executed the lease, written by defendant, which among other things provides:

(I). We find no exemption taking the premises occupied by the dwelling from control of the Rent Regulation because of its use as a rooming house. Section 1 of Rent Regulations for Housing exempts rooming houses which "with the consent of the Administrator" are "brought under the control of the Rent Regulation for Hotels and Rooming Houses". No such claim is here made. There is a further exemption where structures of "more than 25 rooms are rented or offered for rent by any lessee, sublessee or other tenant of such entire structure or premises". Patently such exemption has no application. Subsection 4 of Section 1 provides the Regulation "does apply to entire structures or premises wherein 25 or less rooms are rented or offered for rent by any lessee, sublessee or other tenant of such entire structure or premises, *whether or not used by lessee, sublessee or other tenant as a hotel or rooming house.*" This does not relieve defendant from control of the Act on the dwelling. The fact Dorothy Morgan operated a rooming house in the dwelling, for profit, by an agent presents no basis for exempting the premises from the regulation. That Dorothy Morgan did not occupy one or more rooms in the rooming house is no justification, in our opinion, for taking the premises from the regulation. There is no requirement in the regulation that the operator of a rooming house shall live on the premises. Whether the operator does or does not live on the premises, does or does not rent rooms, does not alter the objective of the regulation to control the rent on premises used for dwelling on housing purposes. The necessity is just as great that an overcharge shall not be made on the premises whether the lessee does

"Parcel No. 1 House at 3825 Delmar Blvd. and 35 foot lot upon which the same is located    Rent $35.00 per Mo.

Parcel No. 2 35 foot lot adjoining on the east of 3825 Delmar Blvd.    Rent 30.00 per Mo.

Parcel No. 3 Lot, 55 foot front by 150 foot depth adjoining on the west of 3825 Delmar Blvd.    Rent 35.00 per Mo.

     Total Rent      $100.00 per Mo."

or does not live on the premises. What the lessee pays for rent regulates what the roomers pay for rent. If there is no control on what the rent shall be that is exacted of the lessee, in turn there is no control on what the room rent shall be, payable by the roomers.

■ (II). The dwelling was, in accordance with rent regulations, registered with the Office of Price Administration, with the maximum legal rent fixed at $35.00 per month. Section 9 of the rent regulation provides: "The maximum rents and other requirements provided in this regulation shall not be evaded, either directly or indirectly, in connection with the renting or leasing * * * of housing accommodations * * * by tying agreement, or otherwise."

Do the facts in this case show the defendant, directly or indirectly, evaded the maximum rent on the premises by tying agreement, or otherwise? Defendant urges in his brief that there was no evasion or tying contract in this case because Dorothy Morgan did not request rental of the dwelling separate from the lots and because rental of the lots is set out in the lease separate from rental of the dwelling. That defendant's position in this respect may not be misunderstood we quote from his brief: "The lease of the three pieces of property contains the exact terms that Miss Morgan requested and demanded." In passing on the purpose of defendant not to violate rental regulations in rental of the lots with the dwelling, we believe a proper setting of the parties will serve a salutary purpose. Defendant is an active practicing lawyer, very positive and forceful in manner of speech, a man able to take care of himself in court on most any occasion. We assume as a matter of fact he knew the rental regulation. Dorothy Morgan testified in this case. She appeared timid. It was with difficulty the Court was able to hear her testimony. She impressed the Court as being frank but not as a positive or forceful character. Dorothy Morgan evidenced ignorance of the rental regulations. The stipulation of facts is not as revealing as the testimony of Dorothy Morgan on the attitude of defendant on the occasion of the first interview between defendant and Dorothy Morgan.

There is no conflict between her testimony and the stipulation. The testimony of Dorothy Morgan is to the effect that the defendant met her at 3860 Washington "and stated how the—how they had to rent the house and lot, thirty-five dollars—the lot west of the house was thirty-five dollars and the lot east of the house was thirty dollars; and I asked him if the place was being sold, and he said yes, the place was being sold and that *they had to rent together because they had to sell together.*" Defendant knew that Dorothy Morgan was buying the furniture and equipment of Mr. Dunn and intended to . continue the operation of the rooming house. After the first conversation between defendant and Dorothy Morgan, Dorothy Morgan concluded her transaction with Mr. Dunn. She was then faced with the situation of owning the equipment in a rooming house, of having no lease and being under the impression that she could be dispossessed on statutory notice. Under these circumstances, revealed to defendant, she began to press the defendant for a lease. Defendant did not respond immediately with the lease. Testimony of Dorothy Morgan, as developed by defendant in his cross-examination, is revealing of the situation existing between them at this time and the compulsion under which Dorothy Morgan acted:

"Q. Now will you just tell us about how many times you called me, asking for this lease, between that time and the 14th of October, when the lease was finally signed, how many times did you ask? A. After you wouldn't accept my rent, Mr. Edwards, I did—I begged you for the lease several times."

Refusal to accept rent without a lease did not tend to allay the apprehension of the tenant as to her predicament. The examination continues:

"Q. You demanded the lease, did you not? A. I really wanted the lease.

Testifying further, on examination by the Court:

"Q. Did you ever use the lots for any purpose? A. No, I didn't.

"Q. Well, what did you rent them for? A. Because I had to, to get the building.

"Q. Well, I don't understand why you had to. You haven't said anything about why you had to rent the lots. That is what I am interested in. What was said by anybody at that time that led you to believe you had to rent the lots? That is what I am interested in knowing. A. Well, Mr. Edwards said they had to rent together because they had to sell together."

Getting down to the occasion when the lease was actually executed, and further indicating the position occupied by the parties:

"Q. Did you say anything to him about you didn't want the lots? A. No, I didn't, because Mr. Edwards never—if I was dissatisfied about something, he just changed the subject and went to something else. When he brought that lease out, after I begged him for it all that time, when he brought it out, I started crying, and I says: 'When I put up the earnest money on the place the rent was $65.00.'

"Q. How much? A. Sixty-five. *And he says he wanted the place vacated, so naturally I put my name on there in a hurry, because*—and the furniture, to have sold it out, wouldn't even have been worth the mortgage I had on it, which was around $300.00 or $400.00." (Emphasis added.)

Dorothy Morgan's testimony as to defendant's attitude in the negotiations was as follows:

"Q. He told you that they had to rent together? A. Yes.

"Q. Because they were for sale? A. They had to rent together because they had to sell together. Oh, Mr. Edwards was very positive and I didn't—

"Q. What do you mean—positive? About what? A. I mean he was very—not positive, but firm—that when he stated something, he stated it like he really meant it.

"Q. Well, he said he was going to rent the whole business together—the two lots and the house? A. Yes; that is right."

To support his claim that rental of the lots was not an evasion of the maximum rent on the dwelling, defendant lists a line of cases of the type of Scheide v. Porstmann, 66 F.

Supp. 483; Porter v. Jorgensen, D.C., 69 F. Supp. 13, 14; and Sullivan v. Porter, 5 Cir., 160 F.2d 648. The Scheide case concerned the inclusion of four and one-half acres of farm land with a dwelling house. The Court held the landlord was not subject to treble damages because "I find they acted in good faith". In the Jorgensen case the landlord was charged with a tying arrangement on the rental of an apartment conditioned on purchasing furniture, but the Court said: [D.C., 69 F.Supp. 14]

"We are not confronted with the usual situation where a landlord, as a subterfuge, makes a purchase or agreement of purchase of furniture a condition of renting housing accommodations.

*    *    *    *    *    *

"I have no sympathy with landlords or others who have resorted and do resort to various *stratagems* to avoid the controls * * *. On the contrary, the evidence carries the conviction that the sale of the furniture was a bona fide sale by one who had not rented his property before, *and who, acting in good faith, took the precaution of ascertaining from the Office of Price Administration the manner in which the property could be rented and the furniture sold.*" (Emphasis added.)

The Sullivan case concerned a sale of liquor with an alleged tying agreement compelling the purchase of wine, but the Court found that: [5 Cir., 160 F.2d 649] "When these customers willingly bought beer and wine, paying the ceiling price for each, *and desiring to buy both,* they merely bought two commodities * * *."

These authorities do not fit the facts of the present case. The defendant told Dorothy Morgan that the dwelling must be rented together with the lots, which was tantamount to saying defendant would not rent the dwelling unless Dorothy Morgan rented the lots. When Dorothy Morgan approached resisting the addition of the second lot by a statement "When I put up the earnest money on the place, the rent was $65.00" defendant countered with a demand "the place" be vacated. At that time the tenant had purchased the furniture and equipment to operate the house and was in

the position where she thought she was compelled to meet the defendant's demands, and she did so by executing the lease. Never was there any discussion of renting the lots independent of the house. Dorothy Morgan had no use for the lots. Defendant knew she was renting the dwelling to run a rooming house. The price put on the lots —one equal to the dwelling and the other lacking only $5.00 of the rent on the dwelling—throws some light on the purpose of transaction. There is far more justification for a forced tying purchase of tangible personal property as a condition of rental because in such cases at least the tenant has some consideration for the excess rent charged. The only conversation appearing in the case about use of the two vacant lots by Dorothy Morgan, is objection voiced by her to keeping the weeds cut on them. Sixty-five dollars a month is rather a high price for this dubious privilege. We are unable to see how the facts in this case can be reconciled with those cited by the defendant, where the "customers willingly" purchased furniture or beer and wine because they "desired to buy both". Dorothy Morgan did not willingly rent the lots but was forced to because the rental of the lots was a condition imposed by the defendant for rental of the dwelling house.

We are not holding that the rent regulations would have prohibited defendant from renting his vacant lots to Dorothy Morgan had she "desired" to rent them and "willingly" entered into negotiations consummating their rental any more than the rent regulations prohibit the sale in good faith of furniture to a person who is renting an apartment in which the furniture is located where the tenant is willing and desirous to acquire the furniture. Such is not the case presented by the record before us.

We conclude rental of the lots with the dwelling house was a tying agreement for the purpose, on the part of defendant, of evading maximum rent on the dwelling house and as such was an evasion prohibited by the Act and the regulations under it.

There is a suggestion in defendant's brief that no rent has been paid on the dwelling since this case was instituted, in February 1947. The excess rent charged may have been consumed in the meantime, at a lawful rate. The stipulation eliminates the issue of double damages. The injunctive order can be submitted in accordance with the present situation if that feature of it can be agreed upon; otherwise further hearing will be held to determine exact order called for. Let findings of fact, conclusions of law and judgment be submitted accordingly.